Semagraph Company v. Commissioner.
Semagraph Co. v. Commissioner
Docket No. 1790.
United States Tax Court
1944 Tax Ct. Memo LEXIS 156; 3 T.C.M. (CCH) 812; T.C.M. (RIA) 44264; August 1, 1944
*156 F. A. McCleneghan, Esq., 700 Lew Bldg., Charlotte, N.C., for the petitioner. P. A. Bayer, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: This proceeding involves income tax deficiencies determined against petitioner for its taxable years ended March 31, 1939 and March 31, 1940, in the respective amounts of $3,683.65 and $8,918.98. The single question is whether petitioner, a corporation, was availed of during the years in question for the purpose of preventing the imposition of the surtax upon its sole shareholder through the medium of permitting its gain and profits to accumulate instead of being divided and distributed, within the meaning of section 102 of the Revenue Act of 1938 and the Internal Revenue Code. The tax returns for the years here involved were filed with the collector for the district of North Carolina. Findings of Fact Petitioner is a Delaware corporation with its principal place of business in Charlotte, N.C. From its inception in 1933 petitioner's stock has been wholly owned by Curtis B. Johnson. Johnson, at all times here material, also has been the publisher and principal owner of the Charlotte Observer, a daily newspaper, *157 and, until its merger with petitioner as hereinafter set forth, was the sole stockholder of the Curtis B. Johnson Corporation. In 1925 B. L. Green was a machinist employed by the Observer. Previously he had been a linotype operator, an apprentice boy and a carrier with the same newspaper. In the year noted, Green, in his spare time, commenced to design a machine, called the semagraph, incorporating a principle which would obviate the manual operation of linotypes. Three or four years later Green's idea and his first model of the semagraph were brought to the attention of Johnson who thereupon agreed to provide Green with funds necessary for the continuation of the semagraph's development. He purchased $32 worth of parts with which Green began the construction of a second model and, in 1930, suggested that Green devote his full time to the invention. Accordingly, Green left the Observer and became an employee of the Curtis B. Johnson Corporation and later the petitioner, upon its incorporation. He was charged with the further work and development of the semagraph. A third model was completed in 1932 and was demonstrated before a publishers' meeting in New York in that year. Subsequently, *158 further models were made including one completed in 1938 which incorporated two additional units, a transmitter and a receiver, enabling a person at a point distant from a newspaper composing room to directly cause type to be set up for printing purposes. In a demonstration of the improved semagraph made in June 1938, a full page of printed matter was transmitted from New York City to the composing room of the Observer at Charlotte and there automatically reduced to type. Commencing in May 1940, the last model of the semagraph was put to a 15-month test in connection with the publication of the Observer. It was not known until the end of this period that the semagraph would be a practical success. Various United States, Canadian, French, German and English patents covering the semagraph had been granted commencing in 1932 with the majority issuing in 1937. Green assisted in the patent applications which, when granted, were assigned to his then employer. Petitioner was chartered in February 1933 and commenced operations with capital of $50,000 paid in by Johnson for all its stock. Its objects and powers as stated in its charter were very broad but it was specifically stated that it *159 was "To develop the Semagraph Machine and its patents and the Semagraph Typewriter and its patents." Petitioner took over from the Curtis B. Johnson Corporation the semagraph, its patents and Green's services. It also immediately borrowed $450,000 from the Curtis B. Johnson Corporation and, within the next year, almost $200,000 from Johnson individually. A substantial part of the borrowed funds was invested in listed stocks and government bonds. Subsequently, the Curtis B. Johnson Corporation was determined by the Commissioner to be a personal holding company. Its assets consisted solely of stocks, bonds, notes and real estate. On March 31, 1935, in compliance with the applicable statute and pursuant to resolutions duly adopted, the Curtis B. Johnson Corporation was merged into petitioner under the latter's name. Petitioner thereupon acquired the assets and assumed the liabilities formerly belonging to each corporation. Johnson surrendered his old stock in both companies for cancellation and received 50,000 shares of $1 par stock in petitioner as recognized. Immediately before the merger petitioner had an earned surplus of $8,756.42 and no paid-in surplus while the Curtis B. Johnson *160 Corporation had an earned surplus of $471,337.78 and a paidin surplus of $666,121.16. For its taxable years ended March 31, 1935, 1936 and 1937 petitioner was determined by the Commissioner to be a personal holding company. In 1937 Johnson, theretofore the majority stockholder of the Charlotte Engraving Company, a manufacturing concern, bought out the minority interests and caused this corporation to be merged into petitioner. By the addition of the income from the engraving business, petitioner was thereafter removed from the personal holding company classification for purposes of the surtax on such companies. From its incorporation, petitioner was engaged in the development and promotion of the semagraph. Up to the time of the trial herein it had expended approximately $135,000 in connection with the invention. Johnson from time to time conferred with financiers, printing machinery company executives and newspaper publishers regarding means to be employed and capital which would be required to successfully manufacture, develop and promote the semagraph. Efforts also were made to enlist the financial cooperation of these men and the organizations which they represented with regard *161 to the semagraph's manufacture and distribution. Johnson had concluded that the necessary capital for this purpose far exceeded the total assets of petitioner even after the aforementioned merger with the Curtis B. Johnson Corporation. It was his idea that a new Semagraph Company be organized to acquire merely the semagraph and its patents from petitioner and to engage in its sales and distribution, the new company to be financed principally through the sale of stock to others. Those to whom Johnson talked concerning the semagraph and its financing did not know of petitioner's existence or whether the semagraph was owned by a corporation or by Johnson in his individual capacity. Up to the time of this hearing, no new company had been organized, the semagraph had not been placed on the market and no income had been derived from its ownership, which remained in petitioner. Petitioner's balance sheet as of March 31, 1938, 1939 and 1940, is as follows: Assets
1938
1939
1940
American Trust Co. Cash
$ 10,591.78
$ 12,788.04
$ 9,585.28
Central Hanover B & T Co. Cash
104,456.93
51,859.57
66,859.57
Stocks and Bonds
1,052,755.62
1,052,755.62
1,048,803.12
Dividends Receivable AT Co.
600.00
600.00
Thompson & McKinnon a/c
3,754.79
Semagraph Development
50,659.32
50,659.32
50,659.32
H. D. Bentley Note
7,500.00
7,500.00
7,500.00
The Observer Co.
11,926.74
10,521.10
3,584.73
Sentinel Building
68,287.00
68,287.00
68,287.00
Greenwood Building
11,637.50
11,637.50
11,637.50
Lots
281,250.00
281,250.00
281,250.00
Prepaid Insurance
205.52
632.51
361.84
Machine Shop, Charlotte
6,976.09
6,976.09
6,976.09
Semagraph Mfg. Cost
39,014.47
18,110.24
5,110.24
C. B. Johnson
37,043.21
33,509.87
17,502.49
Engraving Department
38,856.29
48,733.08
52,520.79
Observer Notes Receivable
55,385.61
Totals
$1,721,160.47
$1,655,819.94
$1,690,378.37
Liabilities
Notes Payable C. B. Johnson
$ 159,883.77
$ 126,662.02
$ 126,662.02
C. B. Johnson
32,770.00
Accounts Payable
7.23
103.97
FOAB Tax accrued
83.94
Fed. Title IX S.S. Tax
134.86
39.22
State Unemployment Tax accrued
11.02
Delaware Franchise Tax
150.00
150.00
150.00
1938 Property Taxes
1,694.00
1,683.00
1,683.00
Capital Stock Tax accrued
628.00
779.00
813.00
NC Intangible Tax
27.56
15.22
Reserves for Depreciation
67,717.96
72,282.56
76,847.15
Tennessee Income Tax 1935-36
15,909.76
Capital Stock
50,000.00
50,000.00
50,000.00
Surplus
1,392,169.93
1,404,196.58
1,434,104.00
Totals
$1,721,160.47
$1,655,819.94
$1,690,378.37
*162 For its taxable year ended March 31, 1934, petitioner sustained a loss of $4,895.80. In each year thereafter through March 31, 1940, it had a taxable net income ranging from $3,932.79 in the year ended March 31, 1935, to $64,255.62 in the year ended March 31, 1937. During the two years in question, those ended March 31, 1939 and 1940, petitioner's taxable net income was $14,816.18 and $34,154.96, respectively. Among the deductions made in computing such income was $20,992.14 in 1939 and $13,000 in 1940 for abandoned semagraph models, patterns and tools. Similar deductions had been taken in previous years. But one dividend was declared and paid by petitioner from its inception through March 31, 1940, and that was $10,000 paid during its taxable year ended March 31, 1938 because of the advent of the undistributed profits tax. Another dividend of $10,000 was paid in 1941 when petitioner realized a substantial capital gain and a $30,000 dividend was paid in 1942. Had petitioner's income for the years in question been distributed, Johnson would have had to pay additional income taxes, including surtaxes, of $7,108.49 for 1939 and $19,581.10 for 1940. Petitioner was availed of in each *163 of the years ended March 31, 1939 and 1940 for the purpose of preventing the imposition of the surtax upon its shareholder through the medium of permitting the earnings and profits to accumulate instead of being divided or distributed. Opinion The deficiencies arise as a result of respondent's holding that petitioner permitted its earnings and profits for its taxable years ended March 31, 1939 and March 31, 1940, to accumulate beyond the reasonable needs of its business. Section 102 (a) of the Revenue Act of 1938 and the Internal Revenue Code levies a surtax upon corporations which are availed of for the purpose of preventing the imposition of the surtax upon its shareholders by accumulating rather than distributing its earnings and profits. Thus, the element decisive of the issue presented is the existence or non-existence of the purpose of preventing the imposition of surtax upon Johnson, its sole shareholder. In this connection, however, section 102 (c) provides that the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the offensive purpose unless the corporation shall prove *164 to the contrary by a clear preponderance of the evidence. In view of respondent's above stated holding, which is presumptively correct, petitioner has the burden first of proving that its accumulations of income for the years in question were within the reasonable needs of its business. If it fails of this, the stronger presumption created by section 102 (c) attaches thus casting upon petitioner a more difficult burden than it would otherwise have in the matter of proving an absence of purpose to avoid surtax on Johnson. The questions of reasonable needs and purpose are pure questions of fact which necessarily must be determined solely upon the facts appearing in the instant case. In resolving them it is our function to "draw inferences, weigh the evidence and declare the result." ; ; affirmed . Inquiring first into the needs of petitioner's business, was the accumulation of petitioner's entire income for its taxable years ended March 31, 1939 and March 31, 1940, reasonably necessary in view *165 of the character and requirements of its business? We think not. While petitioner, perhaps, may not be said to have been a mere holding or investment company during these years, certainly it was principally such. Aside from its engraving department and the capitalized semagraph costs, which together were included in its assets on March 31, 1938, at $128,530.08, petitioner's assets of $1,721,160.47 consisted almost wholly of investments in stocks, bonds, real estate and in cash. The evidence shows that net income attributable to the engraving business amounted to approximately $10,000 in the year ended March 31, 1939, and $4,000 in the following year. No income arose from the semagraph and there has never been such. Petitioner's surplus on March 31, 1938, the beginning of the first taxable year here involved, was $1,392,169.93. One year later it was $1,404,196.58. It was not contended that the engraving business, which appears to have been treated as a separate division of petitioner, required the accumulation of profits for any purpose. Nor was any evidence adduced respecting the operation and monetary needs of the engraving department. Accordingly, it must be disregarded in *166 considering the question at hand. The picture thus presented as of the beginning of the periods involved is that of a nonmanufacturing corporation, wholly owned by one person, having as its assets substantial investments plus the patents on an invention the practicality of which was yet to be proved and having a surplus of approximately $1,400,000. In these circumstances we can not say that the immediate reasonable needs of petitioner's business required the accumulation of all or any income arising in each of the two taxable years which followed. That petitioner's existing surplus far exceeded any anticipated further semagraph patent and development cost is fully apparent from the evidence. The semagraph had by then reached an advanced stage in its development and the patent applications and their attendant expenses had largely been met. In fact, the balance sheets show no increase whatever in the capitalization of semagraph patents during the years in question. Moreover, all expenditures made by petitioner in connection with the invention up to 1944 totaled only about $135,000, a small figure when compared with petitioner's worth. Of course, there was no other current neeed for money, *167 since petitioner was engaged in no other activity requiring the use of capital. But petitioner seeks to justify its accumulation of earnings and profits on the basis of immense future financial demands which the manufacture, distribution and promotion of the semagraph would entail. Petitioner's sole shareholder testified that at least $5,000,000 would be required to successfully market the machine. Upon this statement of the one vitally interested party to the proceeding, unsupported by any evidence detailing specific facts and figures, petitioner rests its contention that this case falls within the rule that a corporation may accumulate reasonable amounts for proposed expansion, plant acquisition, business hazards, etc., without running afoul of section 102. See ; ; ; . We are in entire accord with the principle applied in the cases just cited and with the results there reached under their respective *168 facts which, however, are not comparable to the facts brought out by the present record. In each of the cited cases there was substantial proof of a specific plan, objective or contingency which, in the exercise of good business judgment, demanded the accumulation of the earnings and profits in a reasonable and reasonably definite amount. Similar evidence is not present here. On the contrary, we have merely a broad estimate, without benefit of supporting data, of the projected cost of exploiting an invention the practicality, and consequently the desirability, of which remained unestablished in the years in question. (None of the witnesses considered the semagraph actually a proved success until the termination of its test in 1941). Even assuming that petitioner honestly expected to do the exploiting, and this is an assumption not indicated here as will be demonstrated below, were we to hold such evidence sufficient to establish a reasonable business need for the continuous accumulation of earnings and profits, section 102 (c) would be rendered nugatory and the very purpose of section 102 would be virtually defeated. The adoption of petitioner's position would be tantamount to declaring *169 that all a corporate taxpayer need do to justify the accumulation of its earnings and profits is acquire rights to some new article of merchandise; set a figure far in excess of its free assets as the required cost of marketing such article; and then withhold its introduction to the trade until surplus had reached that figure, through the accumulation of profits which, if the figure were as high as it is here, might well mean indefinitely. We refuse to go so far in construing the phrase "reasonable needs of the business" as used in section 102 (c). The burden of establishing financial requirements for future objectives can not be met so simply. See . For the reasons assigned above we conclude and hold that petitioner's earnings and profits for its taxable years ended March 31, 1939 and March 31, 1940, were permitted to accumulate beyond the reasonable needs of the business. This is determinative of the ultimate question, viz.: the purpose to avoid the surtax upon petitioner's shareholder, unless the absence of such purpose is proved by a clear preponderance of the evidence. Petitioner argues that the purpose for *170 the accumulation of its earnings and profits, as shown by the evidence, was to provide funds to effect the successful manufacture, distribution and promotion of the semagraph. This is the only purpose advanced to warrant the accumulation. Assuming that the evidence does indicate the existence of such a purpose, it is not inconsistent with the further purpose of reducing the surtax burden of its shareholder. ;. And it is to the complete lack of the last mentioned purpose that the evidence must be directed. , aff'd, , certiorari denied . In any event, we disagree with petitioner's view as to the substance of the evidence. At least a taxpayer in this type case must show that it and not another is the entity which by necessity requires the accumulated funds for the purpose relied upon in justification of such accumulation. While there is some testimony in the record to the effect that petitioner intended to manufacture *171 and sell the semagraph, the testimony of Johnson, its sole and, hence, controlling shareholder, is to the direct contrary. After indicating that it was planned that a new company be organized with a capitalization of at least $5,000,000, Johnson went on to say upon cross-examination, "I do not recall whether the contract was signed or agreed to as to the amount of common stock I would get or whether I would have to put in any money, or not. * * * the present Semagraph Company [petitioner] owns securities in the way of many stocks and bonds, and the new company to own the Semagraph would not have any interest in the assets of the present company beyond the Semagraph and its patents." Thus, it not only appears that Johnson did not intend that petitioner should market the semagraph, but it further appears that petitioner's surplus, including the additions to surplus resulting from the accumulations of earnings and profits in question, were not to be risked upon the semagraph's promotion. The ground upon which petitioner rests its appeal disappears with this admission. It is stipulated that Johnson's taxes would have been substantially increased had petitioner's earnings been distributed. *172 There remains no explanation for the accumulation of petitioner's earnings and profits, much less a purpose established by a clear preponderance of the evidence, other than the avoidance of surtaxes upon Johnson. The conclusion that petitioner was availed of during the taxable years ended March 31, 1939 and March 31, 1940, for the purpose of preventing the imposition of the surtax upon its shareholder within the meaning of section 102 (a), in view of the evidence, is required by section 102 (c) and is inescapable in any event. It is so held. Decision will be entered for respondent.